FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 07, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

PATRICK G. BROTHERTON,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

NO. 2:17-CV-00098-JLQ

ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is Defendant' Motion for Summary Judgment (ECF No. 28). Response and Reply briefs have been filed. (ECF No. 35 & 41). The court heard oral argument on the Motion on July 26, 2018. Plaintiff was represented by Jess Casey and Marshall Casey. Assistant United States Attorneys Joseph Derrig and Rudolf Verschoor appeared on behalf of Defendant. This Order memorializes and supplements the court's oral rulings.

**I. Introduction**

Plaintiff, Patrick Brotherton, filed this action against Defendant, the United States of America, on March 15, 2017. Plaintiff brings two claims relating to medical care he received in January 2014. Plaintiff asserts failure to secure informed consent in violation of RCW 7.70.050 and medical negligence under RCW 7.70.040. These claims are asserted on the basis of care provided by "Dr. Sim or the VA medical personnel."

The Defendant (hereafter "Government") argues Dr. Sim, the VA physician, had no duty to obtain informed consent because that duty belongs to the surgeon, Dr. Barrow, not to the referring physician. On the negligence claim, the Government argues Dr. Sim did not

ORDER - 1

breach a duty as he conveyed lab results to Dr. Barrow. Further the Government argues there is no causation between Dr. Sim and Plaintiff's injury as Dr. Barrow performed the surgery which ultimately led to amputation[1].

Plaintiff argues his expert Dr. Leo opines Dr. Sim "is not allowed to just abandon [Plaintiff] and do nothing when [Plaintiff] faces a significant and modifiable risk due to diabetes." (ECF No. 35, p. 3). On informed consent, Plaintiff argues Dr. Sim had a duty because he had specific knowledge of Plaintiff's history of uncontrolled diabetes. (*Id*. at p. 19-20).

**II. Factual Background**

In summary judgment proceedings, the facts are viewed in a light most favorable to the non-movant, in this case the Plaintiff. The following facts are set forth in a light favorable to the Plaintiff and key factual disputes are noted. Defendant filed a 75-paragraph Statement of Facts (ECF No. 29). Plaintiff filed a 55-paragraph Statement of Facts in Response (ECF No. 36). Local Rule 56.1(b) provides a responding party "must explicitly identify any fact(s) asserted by the moving party which the opposing party disputes or clarifies. (E.g.: "Defendant's fact #1: Contrary to Plaintiff's fact #1 ...)". Plaintiff's Statement of Facts in Response only specifically identifies two of the Government's facts which he disputes -- Government's Facts #5 and # 13. Therefore, the facts at issue are largely undisputed.

Plaintiff was first diagnosed with diabetes in 1996. For some period of time he took insulin, but after having gastric bypass surgery in 2004, he ceased taking insulin. (ECF No. 36, ¶¶ 4, 6). Dr. Daniel Sim, M.D., was Plaintiff's primary care physician at the Mann-Grandstaff VA Medical Center (hereafter "VA"). (ECF No. 29, ¶ 1). Plaintiff first saw Dr. Sim for medical care at the VA in August 2004, and the medical records from the visit note

---

[1]The court has been informed Plaintiff has pending claims against Dr. Barrow in state court. (ECF No. 5-4).

ORDER - 2

an A1C of 8.3. (ECF No. 29, ¶ 6). A hemoglobin A1C reading represents a three-month historical view of a patient's blood glucose level. (ECF No. 36, ¶ 1).

Over the years, Plaintiff's A1C level was routinely higher than the desired score of 7.0 or lower. Dr. Sim testified Plaintiff's diabetes was "uncontrolled". Over the years, Dr. Sim recommended and prescribed various medications, but Plaintiff preferred to attempt to control his diabetes through lifestyle changes. Plaintiff tried the medication, Metformin, but had side effects, and was resistant to trying another, Glipizide.

On January 29, 2013, Dr. Morton, a podiatrist at the VA, diagnosed Plaintiff with a diabetic foot ulcer on his left foot. (ECF No. 29, ¶ 9). On May 30, 2013, Dr. Morton referred Plaintiff to a non-VA orthopedic surgeon for evaluation and treatment of Plaintiff's malunion right ankle fusion. (*Id*. at ¶ 11). The VA authorized a visit to the surgeon for evaluation and treatment of the right ankle. (*Id*. at ¶ 12). Plaintiff was referred to Dr. Craig Barrow, who is not a VA employee or U.S. government employee. (*Id*. at ¶ 4). Dr. Barrow first saw Plaintiff on August 19, 2013. Dr. Barrow was aware of Plaintiff's diabetes and the ulcer on his left foot. Plaintiff, on his intake form, wrote his diabetes was "controlled". (*Id*. at ¶ 18).

At the August 19, 2013, appointment, Dr. Barrow discussed the treatment plan for a corrective osteotomy surgical procedure on Plaintiff's right ankle. Dr. Barrow discussed the risks of surgery, including amputation. (ECF No. 29, ¶ 20-21). Plaintiff signed a consent form for the planned surgery. (*Id*. at ¶ 22). On September 5, 2013, Dr. Sim sent Plaintiff a letter informing him his A1C level was 8.2, with a recommended target of less than 7.0. He recommended Plaintiff take the medication, Glipizide. (*Id*. at ¶ 25). Dr. Sim then saw Plaintiff for various issues on September 10, 2013; October 10, 2013; and October 23, 2013. (*Id*. at ¶ 26-29).

On October 28, 2013, Plaintiff saw Dr. Barrow again, and Dr. Barrow examined the ulcer on the left toe and noted it was improving and slowly healing. Dr. Barrow saw Plaintiff again on November 25, 2013, and again noted the ulcer on the left foot was still slowly

ORDER - 3

healing. Dr. Barrow was waiting to perform the surgery on the right ankle until after the ulcer on the left foot had fully healed. At an office visit on January 7, 2014, Dr. Barrow found the left foot had sufficiently healed and decided to proceed with surgery. (*Id*. at ¶ 34).

At the January 7, 2014 office visit, Dr. Barrow explained the risk of surgery and Plaintiff signed a consent form. Dr. Barrow requested some pre-surgical labs, but did not request a medical clearance evaluation from Dr. Sim or the VA. On January 10, 2014, Plaintiff telephoned Dr. Sim's office and left a message that he was having the surgery on January 17, 2014, and asked if he could have his blood work done at the VA. The blood work was done and showed an A1C of 9.6[2]. The lab results were sent to Dr. Barrow on January 16, 2014, the day before the surgery. (ECF No. 29, ¶ 39). Dr. Barrow testified he did not review the A1C report prior to the surgery, but did conduct a blood glucose test the morning of the surgery. (ECF No. 29-2, Depo. of Dr. Barrow, p. 30-31).

Dr. Barrow's opinion is the A1C test was not a contraindication to surgery, and from the blood sugar test performed the morning of the surgery, Dr. Barrow determined Plaintiff's blood sugar level was sufficient to proceed with the surgery. (*Id*. at ¶ 40-41). Plaintiff signed another consent form on the day of the surgery advising of the risks of surgery. The surgery was performed on January 17, 2014, and on January 20, 2014, Plaintiff was discharged. (*Id*. at ¶ 49). Discharge instructions told Plaintiff to monitor his blood sugar closely, take diabetic medications as directed, or otherwise he would be at "an increased risk of infection, wound problems and bone healing delays." (*Id*. at ¶ 50).

---

[2]According to the records, Plaintiff took the pre-operative lab orders(including CBC, CMP) to the VA on Monday January 13, 2014, but only the A1C was done at that time, and the other tests were performed at Holy Family Hospital the morning of surgery. (ECF No. 15-3, p. 10).

ORDER - 4

Plaintiff states his blood sugar level was 283 at discharge and claims Dr. Barrow did not instruct him on blood sugar monitoring. (ECF No. 36, ¶ 46). Three days after discharge, on January 23, 2014, Plaintiff contacted the VA and requested post-surgical care and assistance, including possibility of placement in a skilled nursing facility. (*Id.* at ¶ 47). Placement in a nursing facility was not immediately available, and on January 29, 2014, Plaintiff reported he was doing fine at home and declined nursing facility placement.

Plaintiff was admitted to Holy Family Hospital on February 8, 2014, for I & D (irrigation and debridement) for "wound dihiscence" and ulcer and cellulitis of the surgical site. (ECF No. 29-2; Ex. F-143). By February 20, 2014, after further attempts at debridement and wound treatment, Dr. Barrow discussed with Plaintiff the need for a below-knee amputation. (Id. at Ex. F-144). The amputation procedure was performed on March 19, 2014.

### III. Discussion

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to

support the nonmoving party's case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id*.

Although a summary judgment motion is to be granted with caution, it is not a disfavored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(citations and quotations omitted).

**B. The 'Informed Consent' Claim**

Plaintiff's Complaint asserts two claims. The first is a failure to secure informed consent, and Plaintiff cites to RCW § 7.70.050. Plaintiff alleges: "Dr. Sim or the VA medical personnel failed to inform Mr. Brotherton of the material risk that Mr. Brotherton would lose his foot as a result of the surgery." (ECF No. 1, ¶ 4.3). A claim based on failure to secure informed consent has four elements under Washington law. *Backlund v. Univ. of Washington*, 137 Wash.2d 651 (1999); RCW § 7.70.050. The claimant must establish:

    1) The health care provider failed to inform the patient of a material fact or facts relating to treatment;

    2) The patient consented to the treatment without being aware of or fully informed of such material fact or facts;

    3) A reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts; and

    4) The treatment in question proximately caused injury to the patient.

*Id.*

The critical issue here is whether Dr. Sim, who did not perform the surgery, had a legal duty to secure informed consent regarding Brotherton's ankle surgery performed by Dr.

ORDER - 6

Barrow. "The existence of a legal duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent." *Christensen v. Royal School Dist.*, 156 Wash.2d 62, 67 (2005). "The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a plaintiff's interests are entitled to legal protection against the defendant's conduct." *Volk v. DeMeerleer*, 187 Wash.2d 241, 266 (2016).

Dr. Sim did not have a legal duty to obtain informed consent for the surgery, or to advise Plaintiff of the risks of surgery – that legal obligation belonged to the surgeon, Dr. Barrow. The Washington case which most directly addresses the legal duty of a referring physician under Washington law is *Bottemiller v. Gentle Dental*, 2002 WL 31895159 (Wash. Ct. App. 2002)(unpublished). There the court examined the duty of a referring physician to provide informed consent and stated, "the majority of jurisdictions that have addressed whether referring physicians have a duty to obtain a patient's informed consent have concluded that they do not." *Id.* at *10. The court observed a minority of courts have imposed a duty when "the referring physician has retained a degree of participation and control in the treatment." *Id.* at *11. The *Bottemiller* court concluded that because the referring physician did not participate in or control the surgery, there was no duty to inform the patient that experts disagreed as to the benefit of the surgery or advise as to alternatives to surgery.

The parties cited, and referred to at argument, *Alexander v. Gonser*, 42 Wash.App. 234 (1985) and *Howell v. Spokane & Inland Empire Blood Bank*, 114 Wash.2d 42 (1990), however neither case is directly on point. Both cases involve the duty of informed consent as between a physician and hospital staff. They do not address the duty between a primary care/referring physician and a specialist/surgeon. In *Alexander*, the issue was "whether a hospital has an independent duty to inform a patient of test results administered at the request of the treating physician." 42 Wash.App. at 235. The court answered in the negative. To the

ORDER - 7

extent it is applicable, *Alexander* supports the conclusion Dr. Barrow had the informed consent duty, and not the VA or Dr. Sim.

In *Howell*, the court again rejected an argument that the hospital, Deaconess Hospital, had an informed consent duty, and instead found the duty rested with the physician. The court stated: "To provide for equal informed consent obligations as to every person and entity falling within the definition [of health care provider] would not be justified." *Id.* at 55. The Washington Supreme Court further stated, "it is the duty of the physician to inform patients of the risks, general or specific, involved in surgical procedures." *Id.* at 56. Here, the physician performing the procedure was the surgeon, Dr. Barrow.

It is undisputed Dr. Sim did not participate in or control the surgery. Plaintiff's expert, Dr. Leo, testified that in his review of the medical records he saw nothing indicating Dr. Sim planned the surgery, participated in the surgery, or advised Plaintiff to have the surgery. (Depo. of Dr. Leo, at ECF No. 45-1, p. 34-35). It was Dr. Morton, a VA podiatrist, who referred Plaintiff to Dr. Barrow. (ECF No. 29, ¶ 11). Further, Plaintiff's expert, Dr. Leo, testified he did not expect a referring primary care physician to obtain informed consent from the patient for the procedure they are being referred for. Specifically, he testified when asked: "No. I do not view it as my duty or the duty of a primary care physician to obtain consent for a specific procedure that assumes a fund of knowledge regarding the benefits, risks, and alternatives to that particular procedure that most primary care doctors wouldn't have." (*Id.* at p. 19-20).

This makes common sense. The physician performing a procedure should advise on the risks of the procedure. When a primary care physician refers a matter to a specialist, it is not logical to impose a legal duty on the primary care physician to explain the risk of a procedure which the specialist may perform. Generally the reason for the referral to a specialist is because the specialist has more training, knowledge, or experience in the particular area of medicine.

ORDER - 8

Dr. Sim had no legal duty to obtain informed consent from Mr. Brotherton for the surgery performed by Dr. Barrow. Further, even if this court were to find Dr. Sim had a duty to advise of the risks of surgery, which it does not, it is undisputed Dr. Barrow did advise of surgical risks[3]. Dr. Barrow first discussed the risks of surgery at an office visit on August 19, 2013, and Plaintiff signed a consent form at that time. (ECF No. 29, ¶ 21-22). Dr. Barrow then discussed the risks of surgery at an office visit on January 7, 2014, ten days before the surgery. (*Id*. at ¶ 34-35). Dr. Barrow advised again of the risks of surgery on January 17, 2014, the day of surgery, and Plaintiff signed a consent form. (*Id*. at 43-44). See *Bynum v. Magno*, 125 F.Supp.2d 1249, 1255 (D. Hawaii 2000)("where the surgeon obtains informed consent, the referring physician's duty to obtain it may be discharged because the chain of causation is broken.").

Defendant's Motion for Summary Judgment on the first claim in the Complaint--failure to secure informed consent, is **GRANTED**.

### C. Medical Negligence Claim

Plaintiff's second claim of negligence, pursuant to RCW § 7.70.040, alleges Dr. Sim "failed to exercise the degree of skill, care, and learning expected of a reasonably prudent surgeon." (ECF No. 1, ¶ 5.2). The allegations of the Complaint are Dr. Sim knew of Plaintiff's impending ankle surgery, knew of his diabetic condition, ordered an A1C blood test in preparation for surgery, received the blood test results, reported them to Plaintiff, but did not advise against having the surgery. (*Id*. at ¶ 2.2-2.6).

RCW § 7.70.040 provides:

---

[3] Any challenge Plaintiff may have to the adequacy or thoroughness of Dr. Barrow's advice and consent forms is not before this court. It appears Plaintiff is pursuing an informed consent claim against Dr. Barrow in state court. (ECF No. 5-4).

ORDER - 9

> The following shall be necessary elements of proof that injury resulted from the failure of the health care provider to follow the accepted standard of care:
> (1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
>
> (2) Such failure was a proximate cause of the injury complained of.

A negligence claim requires a showing of duty, breach, causation, and damages. *Ranger Ins. Co. v. Pierce Co.*, 164 Wn.2d 545, 552 (2008). "The existence of a legal duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent." *Christensen v. Royal School Dist.*, 156 Wash.2d 62, 67 (2005). Generally expert testimony is required to establish the standard of care. *McLaughlin v. Cooke*, 112 Wash.2d 829, 836 (1989). Expert testimony is typically also required on the issue of proximate cause in medical malpractice cases. *Id.* at 837. "The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a plaintiff's interests are entitled to legal protection against the defendant's conduct." *Volk v. DeMeerleer*, 187 Wash.2d 241, 266 (2016).

As expert testimony is required to establish the standard of care and causation in medical negligence cases, the court now addresses the Government's **Motion to Exclude Opinions of Dr. Leo and Dr. Coleman (ECF No. 43)**. The Government filed, on the same day as its Reply in support of summary judgment, a Motion to Exclude three of the opinions stated by Dr. Leo, and to entirely exclude Dr. Coleman as an improper rebuttal expert. Response and Reply briefs were filed (ECF No. 44 & 49).

The Government argues three of Dr. Leo's opinions lack an adequate foundation and are unreliable: 1) that the standard of care required Dr. Sim, a primary care physician, to perform a preoperative evaluation for surgery, even though one was not requested by the

surgeon; 2) that a preoperative A1C of 9.6 required cancellation of Plaintiff's surgery; and 3) that Plaintiff's preoperative A1C caused his infection. (ECF No. 43, p. 2). The Government contends Dr. Coleman is not a rebuttal expert and should be excluded. The Government argues Dr. Coleman did not even review the initial reports of Defendant's experts, but rather only reviewed Dr. Leo's report and deposition. Thus, the Government argues Dr. Coleman was been listed only to endorse Dr. Leo's opinion and is cumulative and improper rebuttal testimony.

Plaintiff responds Dr. Leo is qualified and his testimony is reliable and should be allowed. Plaintiff argues Dr. Coleman's testimony was rebuttal to the extent it was offered to counteract the implication that Dr. Leo, who practices in California, was not qualified to testify as to the Washington standard of care.

The day after the Government's Motion to Exclude was filed, the Washington Supreme Court issued its opinion in *Reyes v. Yakima Health District*, 419 P.3d 819 (Slip Op. June 21, 2018), where the court stated: "This is a case about the sufficiency of expert witness testimony in a medical malpractice suit." The Court stated: "Allegations amounting to an assertion that the standard of care was to correctly diagnose or treat the patient are insufficient. Instead, the affiant must state specific facts showing what the applicable standard of care was and how the defendant violated it." (*Id*. at 9). The Government argues in part Dr. Leo's opinion lacks specificity and does not "establish the nature and contours" of the standard of care. (ECF No. 43, p. 1).

The Government essentially argues the three opinions of Dr. Leo, outlined *supra*, do not meet the *Daubert* standard. In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Supreme Court set forth the standard for admitting expert scientific testimony. A federal court is guided by Federal Rule of Evidence 702, and the court serves a gatekeeping function. The court is to attempt to ensure "an expert's testimony rests both on a reliable foundation and is relevant to the task as hand." *Id*. at 597. In assessing reliability,

the court may look to whether a scientific theory or technique has been tested, whether it is subject to peer review, whether there is a known error rate for the study or technique, and whether there is "general acceptance" of the theory or technique. *Id*. at 593-95. The inquiry under FRE 702 is a "flexible one" which seeks to assess the "scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission." *Id*. at 594-95.

Dr. Leo is a licensed medical doctor. He is board-certified and has practiced internal medicine for over 30 years. At his deposition, he testified that he has given testimony as an expert witness over 300 times. He has been consulting as an expert witness for approximately 20 years and testified it is roughly 50/50 as to whether he is consulting for plaintiffs or defendants. He testified he has extensive medical training in diabetes and that roughly 10 to 20% of the patients he sees in his practice are diabetic. (ECF No. 45-1, p. 14-15).

Under Federal Rule of Evidence 702, Dr. Leo is qualified by his "knowledge, skill, experience, training, or education" to offer expert testimony. Under *Daubert*, the court must still assess the reliability of the proffered testimony and whether it will assist the trier of fact. The Government appears to argue Dr. Leo's opinion is not based on sufficient or reliable facts and data: "Instead of responding with a treatise, medical journal, practice guide, policy, hospital standards, or industry practices supporting Dr. Leo's 'duty to inform Dr. Barrow' opinion . . .", the Government argues Dr. Leo rests his opinion only on his own experience. (ECF No. 49, p. 2). However, Dr. Leo's opinion is, at its most basic, that there should have been better communication between Dr. Sim and Dr. Barrow concerning Plaintiff's "uncontrolled diabetes" and the A1C result. One would not expect to find a treatise, medical journal, or studies on when one physician should phone another with test results. When the court inquired at oral argument, Plaintiff's counsel did not direct the court to any treatise or medical journal, but instead relied on language from *Gray v. Davidson*, 15 Wash.2d 257, 267 (1942), specifically: "It is the general rule that when a physician undertakes to treat a

ORDER - 12

patient, it is his duty to continue to devote his best attention to the case until either medical attention is no longer needed, he is discharged by the patient, or he has given the patient reasonable notice of his intention to cease to treat the patient, so that another physician may be obtained."

The Government rests its argument in part on a recent case from this District: *Wright v. United States*, 2:15-CV-0305-TOR, 2017 WL 2590339 (E.D. Wash. 2017). Therein, the plaintiff made a medical negligence claim involving the VA and argued both that a nurse had inadequately communicated with the plaintiff, and that a nurse had inadequately attempted to persuade a physician to order a CT scan. Judge Rice found the nursing expert's opinion lacked a sufficient "basis for the proposed standard of care or any explanation other than a bald conclusion" that the nurses' conduct fell below the standard of care. (p. 6). Judge Rice cited to Washington Practice Tort Law and Practice § 16.21 (4th ed.) concerning the duty of nurses: "Like pharmacists, nurses do not owe a duty to patients that would place them in a position to second-guess the physician or otherwise substitute their judgment in place of that provided by the physician." (p. 8). Ultimately, the motion to exclude the expert testimony was denied as moot, because even considering the expert's opinion, the court granted defendant's summary judgment motion.

The *Wright* case is somewhat analogous to the case at bar as both involve claims of inadequate communication between medical professionals and between medical professionals and patients. The *Wright* court found no duty for a nurse to second-guess physicians. Here, Dr. Leo, who admits he is not qualified to opine as to the standard of care for orthopedic surgeons, argues Dr. Sim, a primary care physician, should have intervened with the orthopedic surgeon, Dr. Barrow, and told him how to proceed, or not to proceed, with a surgical procedure.

Dr. Leo's opinion is essentially the A1C test result was cause for concern, and Dr. Sim should have communicated that concern to Dr. Barrow and Plaintiff. Dr. Leo contends the

ORDER - 13

elevated A1C result posed an increased risk of post-surgical infection. Dr. Leo filed a Second Declaration (ECF No. 38) stating the risk of infection in a patient with well controlled diabetes was 1.7%, and with poor diabetes control (like Plaintiff) it was 6.8%. Dr. Leo thus contends there was a four-fold increase in risk of infection. In *Daubert v. Merrell Dow* ('Daubert II), 43 F.3d 1311 (9th Cir. 1995), after the case was remanded from the Supreme Court, the Ninth Circuit held there must be at least a two-fold increase in the relative risk for their to be legal causation. The court stated: "In terms of statistical proof, this means that plaintiffs must establish not just that their mothers' ingestion of Bendectin increased somewhat the likelihood of birth defects, but that it more than doubled it–only then can it be said that Benedictin is more likely than not the source of their injury." *Id*. at 1320. Here, Dr. Leo claims the relative risk posed by the elevated A1C was four. The Government's expert, Dr. Kraemer, appears to agree there is some support in the medical literature for this calculation, but that even if accepted, an increase from 1.7% to 6.8% "does not even come close to approaching an incidence of infection that is more likely than not." (ECF No. 29-2, p. 145 of 188).

The Government's Motion to Exclude (ECF No. 43) first challenged three opinions of Dr. Leo: "(1) the standard of care required Dr. Sim to perform an unrequested preoperative evaluation; (2) a preoperative A1C of 9.6 required cancellation of the surgery, and (3) Mr. Brotherton's preoperative A1C caused his infection." (ECF No. 43, p. 2). However, the Motion concludes by seeming to request exclusion of all Dr. Leo's opinions, stating, "Dr. Leo's opinions are unreliable and inadmissible." (ECF No. 43, p. 10). The court does not view Dr. Leo's Rule 26 report as opining Dr. Sim was required to perform an unrequested evaluation. Dr. Leo's deposition testimony would not support that conclusion. Nor does Dr. Leo appear to opine an A1C of 9.6 requires cancellation of surgery in all circumstances. Rather, he admits "there is no specific evidence-based target for hemoglobin A1C recommended prior to surgery." (ECF No. 20-1, p. 7). His opinion is it depends on whether

the surgery is elective or emergent, and his opinion appears to be Brotherton's surgery should have been postponed until he was medically optimized. As to causation, Dr. Leo opines of the four-fold increase in risk of infection, as discussed *supra*. The Government's request to strike the opinions of Dr. Leo is **DENIED**.

Dr. Coleman has filed a one-page report (ECF No. 39-1), and it is improper rebuttal. It is not "intended solely to contradict or rebut evidence on the same subject matter identified by another party". Fed.R.Civ.P. 26(a)(2)(D)(ii). Dr. Coleman's report does not purport to rebut the opinions of the Government's experts. Rather, Dr. Coleman's report appears to be an attempt to bolster Dr. Leo's report and is in such respect cumulative. See *Titus v. Progressive Casualty Ins. Co.*, 2011 WL 13233430 (D. Ariz. 2011)(excluding improper rebuttal expert which the court viewed as not rebuttal but an attempt to bolster prior witnesses or select a "better" expert). Dr. Coleman states: "The opinions Dr. James Leo expresses on the standard of care for a primary care physician are the standard of care in Washington." (*Id.*). He then repeats portions of Dr. Leo's opinion, states agreement with those opinions, and concludes the "opinions by Dr. Leo reflect the standard of care for a reasonably prudent primary care physician in the State of Washington." (*Id.*).

To the extent Dr. Coleman was used to rebut the implicit contention the California and Washington standards of care are not the same, such testimony is permissible rebuttal: Dr. Coleman states: "There is no difference in the standard of care in Washington compared to California or nationally." (ECF No. 39-1). However, it does not appear the Government presses the contention Dr. Leo is unqualified to testify on Washington standard of care because he practices in California. Although Dr. Coleman's brief report does appear to be improper rebuttal testimony and largely cumulative, the court in the exercise of its discretion and for the purpose of this motion, **DENIES** the request to strike Dr. Coleman's report.

Returning to Plaintiff's medical negligence claim, and the Government's Motion for Summary Judgment, the Washington Supreme Court recently stated, in *Reyes v.*

*Yakima Health District*, 419 P.3d 819 (Slip Op. June 21, 2018): "In a medical malpractice case, plaintiffs must show that the health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances." (Slip Op. at p. 5 citing RCW 7.70.040(1)). In *Reyes*, the Supreme Court affirmed the lower court's grant of summary judgment for the defendants and addressed whether plaintiff's expert had created a genuine issue of material fact. The Court stated: "In the context of medical malpractice, this requires an expert to say what a reasonable doctor would or would not have done, that the defendants failed to act in that manner, and that this failure caused the injuries. The expert may not merely allege that the defendants were negligent and must instead establish the applicable standard and how the defendant acted negligently by breaching that standard. Furthermore, the expert must link her conclusions to a factual basis." (Slip Op. at 6) (internal quotations and citations omitted). Brotherton has offered expert testimony in support of his claims, and Dr. Leo contends Dr. Sim failed to meet the standard of care.

Dr. Leo contends there was inadequate communication between Dr. Sim and Dr. Barrow and between Dr. Sim and Plaintiff. Dr. Leo submitted an affidavit with his opinion on standard of care (ECF No. 9-1), provided a Rule 26 Report (ECF No. 20-1), and gave deposition testimony. (ECF No. 45-1). Dr. Leo, testified at deposition: "the significant part of this case has to do with the failure of communication." (ECF No. 45-1, p. 48).

Dr. Leo's Rule 26 Report sets forth six ways in which he contends Dr. Sim failed to meet the standard of care (ECF No. 20-1, p. 6):

1. Failing to recognize the poor diabetes control represented by the preoperative hemoglobin A1C of 9.6 obtained on January 13, 2014 represented a markedly increased and modifiable risk of poor surgical wound healing and infection;

ORDER - 16

2. Failing to contract Dr. Barrow to determine whether the surgery was elective or emergent;

3. Failing to ensure Dr. Barrow was aware of uncontrolled nature of Mr. Brotherton's diabetes;

4. Failing to notify Dr. Barrow that Plaintiff was not medically stable to proceed with surgery;

5. Failing to specifically inform Brotherton that his uncontrolled diabetes greatly increased the likelihood of his developing postoperative wound complications; and

6. Failing to fulfill his duty as a PCP in acting to minimize his patient's risks for complications, regardless of Dr. Sim's feelings about his patient's non-compliance, "including not abdicating his duty to provide preoperative medical clearance or non-clearance for the planned surgery." (ECF No. 20-1, p. 6).

Dr. Leo contends the standard of care requires a physician to recognize the impact of poorly controlled diabetes on the post-operative risks of infection and poor wound healing. (ECF No. 9-1, ¶ 5-6; ECF No. 20-1, p. 6). Dr. Leo contends Dr. Sim did not fully understand the relationship between diabetes and poor wound healing. The record is not clear Dr. Sim failed to recognize such risk, and Dr. Leo himself testified it is a generally known medical fact: "It is well known that uncontrolled hyperclycemia impairs white blood cell function and raises the risk of infection." (ECF No. 45-1, p. 37). Further, Dr. Sim's specific amount of knowledge concerning the issue and the extent to which he communicated it to Plaintiff, did not cause Plaintiff's injury (the amputation). Plaintiff had been living with diabetes since 1996, had been on insulin in 2003, and testified he was told diabetes "could cause severe things up and to blindness, wounds not healing very well, loss of limb, death." (ECF No. 29, ¶ 57-58). Further, Dr. Barrow was aware Plaintiff was diabetic, and was aware of slow wound healing, as he monitored the slow healing ulcer on Plaintiff's left foot for several months before performing the surgery on the right ankle.

ORDER - 17

Dr. Leo further opines it would be a violation of the standard of care for a primary care physician in the state of Washington, who is aware of a patient's A1C of 9.6 to approve the patient for an elective ankle surgery. (ECF No. 9-1, ¶ 7). Stated somewhat differently, in the Rule 26 Report, Dr. Leo states Dr. Sim should have notified Dr. Barrow that Plaintiff's diabetes was uncontrolled and Plaintiff was not medically stable to proceed with surgery. (ECF No. 20-1, p. 6). Dr. Sim did not "approve" the surgery because no pre-surgical medical clearance was requested by Dr. Barrow. Dr. Leo testified it is the general practice for a surgeon to request medical clearance if he deems it necessary from a primary care physician. (ECF No. 45-1, p. 69). Dr. Leo testified that in his experience, medical clearance would be requested a month before the surgery, and Dr. Leo would either schedule a specific pre-operative medical clearance office visit, or if the patient recently had an annual exam, clear the patient without further evaluation. (*Id.* at p. 71-72).

Dr. Barrow did not request a pre-surgical clearance of Plaintiff. Rather, Dr. Barrow requested some lab tests, and those tests were performed. Concerning Dr. Leo's opinion that Dr. Sim should have intervened to stop the surgery because of the A1C test result, it is undisputed the test result was sent to Dr. Barrow. (ECF No. 29, ¶ 39). Dr. Barrow testified he also ordered a blood glucose test the morning of the surgery, and the result of that test was more important to him than an A1C score. Additionally, Dr. Leo admits there is not a clear medical consensus on what A1C score would make surgery contraindicated. He states in his Rule 26 Report "there is no specific evidence-based target for hemoglobin A1C recommended prior to surgery," but that studies have shown an increased risk of infection. (ECF No. 20-1, p. 7).

All of these criticisms by Dr. Leo essentially amount to a contention that Dr. Sim should have been more concerned with the A1C result, communicated his concern to Dr. Barrow and Plaintiff, and recommended the surgery not go forward. Dr. Leo believes the surgery should have been postponed until Plaintiff was medically optimized. The

ORDER - 18

Government contends Plaintiff cannot show the surgery would not have proceeded. However, Dr. Barrow testified he had not reviewed the A1C prior to the surgery, and had he seen it, he "possibly" would have still performed the surgery because he does not view the A1C as a contraindication to surgery. (ECF No. 29-2, p. 21-22 of 188).

Dr. Leo is not a surgeon. He testified, "I hesitate to opine as to the standard of care of an orthopedic surgeon." (ECF No. 45-1, p. 42). He further testified: "The question as to what Dr. Barrow's duty was in obtaining a medical clearance for this patient with a number of different medical problems aside from this Type 2 diabetes, is one that I will defer to the orthopedic expert in this case." (*Id.* at 42-43). Thus Dr. Leo does not opine Dr. Barrow should have sought pre-surgical medical clearance, and Dr. Barrow did not seek Dr. Sim's opinion as to medical clearance. However, Dr. Leo claims Dr. Sim had a "duty as the primary care physician to say this patient is not medically cleared or optimized to proceed with surgery and to contact Dr. Barrow and let him know." (*Id.* at 41).

Viewing the facts in the light most favorable to Plaintiff for the purposes of this summary judgment motion, and considering the opinions of Plaintiff's expert, Dr. Leo, the court finds the Government has not established it is entitled to judgment as a matter of law on the medical negligence claim.

**IV. Conclusion**

The Complaint in this matter asserts two claims: 1) Failure to Secure Informed Consent; and 2) Medical Negligence. The court finds as a matter of law Dr. Sim had no duty to secure informed consent for the surgical procedure performed by Dr. Barrow. Dr. Sim did not plan or participate in the surgery. Plaintiff saw Dr. Barrow on multiple occasions prior to the surgery. Plaintiff's informed consent claim was not supported by expert testimony.

Plaintiff's claim of medical negligence was supported by the testimony and report of Dr. Leo, and additionally by the conclusory opinion of Dr. Coleman. The Government's position is supported by its three experts: Dr. Oakley, Dr. Kraemer, and Dr. Ledgerwood. The

ORDER - 19

medical negligence claim thus presents a material dispute between expert witnesses concerning the standard of care, whether it was breached, and causation. Given this dispute, the court denies summary judgment on the medical negligence claim.

**IT IS HEREBY ORDERED:**

1. The Government's Motion to Exclude (ECF No. 43) is **DENIED**.

2. The Government's Motion for Summary Judgment (ECF No. 28) is **DENIED IN PART AND GRANTED IN PART**. The Government is granted summary judgment on Plaintiff's claim that Dr. Sim or VA medical personnel failed to secure informed consent. The Government's Motion is denied as to the medical negligence claim.

**IT IS SO ORDERED**. The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 7th day of August, 2018.

s/ Justin L. Quackenbush  
JUSTIN L. QUACKENBUSH  
SENIOR UNITED STATES DISTRICT JUDGE